

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA          )
                                  )
                                  )
     VS.                          )   1:12-CR-217  JCC
                                  )
                                  )   ALEXANDRIA, VIRGINIA
                                  )    DECEMBER 14, 2012
                                  )
MAURICIO SANTOYO VELASCO          )
_____)

_____

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE JAMES C. CACHERIS**
**UNITED STATES DISTRICT JUDGE**

_____

**Proceedings reported by stenotype, transcript produced by**

**Julie A. Goodwin.**

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:
         UNITED STATES ATTORNEY'S OFFICE
4        By:  MR. MICHAEL BEN'ARY
         Assistant U.S. Attorney
5        2100 Jamieson Avenue
         Alexandria, Virginia  22314
6        703.299.3700
         michael.ben'ary2@usdoj.gov
7

8

9
     FOR THE DEFENDANT:
10       ZWERLING LEIBIG & MOSELEY PC
         By:  MR. JOHN K. ZWERLING
11       114 North Alfred Street
         Alexandria, Virginia  22314
12       703.684.8000
         jz@zwerling.com
13

14       LAW OFFICES OF OSCAR S. RODRIGUEZ, P.A.
         By:  MR. OSCAR S. RODRIGUEZ
15       4500 Le Jeune Road
         Coral Gables, Florida  33146
16       305.445.2000
         osrlaw@aol.com
17

18

19
     OFFICIAL U.S. COURT REPORTER:
20       MS. JULIE A. GOODWIN, CSR
         United States District Court
21       401 Courthouse Square
         Tenth Floor
22       Alexandria, Virginia  22314

23

24

25

1    (DECEMBER 14, 2012, 9:24 A.M., OPEN COURT.)

2           THE COURT:  Take General Velasco.

3           MR. BEN'ARY:  Good morning, Your Honor.  Michael

4    Ben'Ary for the United States.

5           THE COURT:  Good morning, Mr. Ben'Ary.

6           MR. ZWERLING:  Good morning, Your Honor.  John

7    Zwerling and Oscar Rodriguez for --

8           THE COURT:  Good morning, Mr. Zwerling and Mr.

9    Rodriguez.

10          Swear the interpreter in this case, and would note

11   that General Velasco is present and in person.

12       (THE OATH WAS ADMINISTERED TO INTERPRETER.)

13          THE INTERPRETER:  My name is Eva Desrosier.  I'm a

14   federally certified Spanish interpreter.

15       (THE OATH WAS ADMINISTERED TO DEFENDANT.)

16          THE COURT:  General Velasco, has the presentence

17   report been read to you by Mr. Rodriguez and Mr. Zwerling?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  And you've discussed it with him.  Is that

20   correct?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Do you feel the report is accurate

23   concerning your background?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Do you feel the report is accurate

1  concerning your offense conduct?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Do you have any additions, corrections, or

4  comments you would like to make to the report?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  You may have a seat, General.  Okay.

7             Mr. Rodriguez, anything?

8          MR. RODRIGUEZ:  Your Honor, with regards to that --

9          THE COURT:  Why don't you come to the podium, please,

10  sir.

11             I'll note for the record that I received an updated

12  financial statement this morning from the probation officer.

13          MR. RODRIGUEZ:  That is correct.  Good morning, Your

14  Honor.  Oscar Rodriguez on behalf of the General.

15             Your Honor, there's a couple of minor matters that

16  I would like to bring up regarding the PSI.  Would the Court,

17  before we start in the --

18          THE COURT:  Give me the page numbers of where you want

19  to go.

20          MR. RODRIGUEZ:  Okay.  Paragraph 17 there.

21             One moment, Your Honor.

22      (BRIEF PAUSE.)

23          MR. RODRIGUEZ:  Your Honor, good morning.  In

24  paragraph 73 --

25          THE COURT:  All right.

1        MR. RODRIGUEZ:  -- it should reflect --

2        THE COURT:  Let me get to that.

3        MR. RODRIGUEZ:  -- that the family income is not --

4        THE COURT:  Net monthly cash flow?

5        MR. RODRIGUEZ:  Yes, sir.

6        THE COURT:  It says 4- to $6,000 monthly.  Right?

7        MR. RODRIGUEZ:  No.  Paragraph 73 --

8        THE COURT:  Okay.

9        MR. RODRIGUEZ:  -- which is reflected in the net

10   monthly income, it says 21,000.

11        THE COURT:  Okay.

12        MR. RODRIGUEZ:  And it should really -- or it should

13   be 11,000.  And I would like to explain it as follows.

14             Ms. Moran took into consideration the monthly

15   income of the family business, which is from 4- to $6,000 a

16   month.  And the $5,000 that he receives as a pension, she

17   additionally added $3,000 in spousal income that no longer

18   exists.  She has been in the United States for a few months,

19   and she's not receiving any --

20        THE COURT:  So she's not running the sugar cane

21   plantations?

22        MR. RODRIGUEZ:  No, she's not, Your Honor.

23        THE COURT:  Okay.  All right.

24        MR. RODRIGUEZ:  Nor the $7,000 income from other

25   household members.  This does not apply.  I think his portion

1 of the income of the family business is between 4- and $6,000,

2 but we have -- we have, for purposes of today, make that $6,000

3 a month, plus the -- the $5,000 is the pension, which would be

4 a correction on Paragraph 70 of 11,000 --

5          THE COURT:  73, you mean.

6          MR. RODRIGUEZ:  Right.

7          THE COURT:  Okay.

8          MR. RODRIGUEZ:  Paragraph 73.

9             And then the other thing -- the other matter, Your

10 Honor, is that it does not change the numbers, but in this --

11 in the stocks it's reflected that they had $52,082.48.

12          THE COURT:  Okay.  Where are you on that?

13          MR. RODRIGUEZ:  Oh, I'm sorry, Your Honor.  Paragraph

14 67.

15          THE COURT:  All right.  Let me just get to that, sir.

16 Okay.

17             67?  Okay.  The -- where are you beginning, on the

18 bottom of page --

19          MR. RODRIGUEZ:  At the bottom of the page, line 2.

20 The -- it will not change --

21          THE COURT:  The bottom of --

22          MR. RODRIGUEZ:  -- the numbers.  It was just --

23          THE COURT:  Wait a minute.  Let me hold you, please,

24 Mr. Rodriguez.

25             For paragraph 67, it says cash on hand $31,202.77.

1   It's the bottom of page 19.

2           Where are you?  Are you on the bottom of page --

3           MR. RODRIGUEZ:  Right below that it says stocks.

4           THE COURT:  Yeah.

5           MR. RODRIGUEZ:  And the stocks should not be

6   $52,082.48.  It should actually be $12,111.20.

7           The -- the total assets are not affected in the

8   numbers but -- because they're still -- the total assets still

9   come out to $1.561 million and four -- four dollars.

10          It's just that when it was typed and sent to her

11  office, we had -- it was a misprint of one of the lines of cash

12  on hand, and that kind of threw everything off.  But it should

13  include the 12,000 -- the stocks at $12,000, and then the

14  agriculture equipment which is $52,082, and then the real

15  estate properties which are --

16          THE COURT:  Wait a minute.  Let me get to the

17  agriculture equipment now.

18          MR. RODRIGUEZ:  That is --

19          THE COURT:  On page 20?

20          MR. RODRIGUEZ:  Yes, sir.

21          THE COURT:  Okay.

22          MR. RODRIGUEZ:  52,082.

23          THE COURT:  I don't see agriculture equipment now.

24          MR. RODRIGUEZ:  Well, it's agriculture, but it's the

25  equipment in the farms because under that is the real estate

1   properties values, which is $993,228.  It was just...

2           THE COURT:  Okay.

3           MR. RODRIGUEZ:  And then the --

4           THE COURT:  I've got a little trouble following you.

5               On page 20 --

6           MR. RODRIGUEZ:  Let me get the PSI.

7           THE COURT:  Tell me where this change is.

8           MR. RODRIGUEZ:  Page 20.

9               Well, Your Honor, she subdivided it further than

10  what I subdivided it to make it -- simplify it for -- for her

11  yesterday.  And what I --

12          THE COURT:  Okay.  Where -- I mean, I don't see

13  anything on the farm equipment here.

14          MR. RODRIGUEZ:  Well, it says agriculture.

15          THE COURT:  Windmill machinery, I see that.

16          MR. RODRIGUEZ:  Yes, sir.  The windmill machinery and

17  the value of the windmill and the --

18          THE COURT:  Okay.  All right.

19          MR. RODRIGUEZ:  --  and the value of the cars, which

20  are all -- they're assets.  And she did adopt the total assets

21  of $1,561,404.50.  That is -- it's just that the stocks were

22  misplaced in -- in the -- in the paper that I submitted or my

23  secretary submitted.

24          THE COURT:  So the total assets are what?

25          MR. RODRIGUEZ:  $1,561,404.50.

9

1        THE COURT:  Okay.

2        MR. RODRIGUEZ:  And the liabilities are $260,939.71.

3        THE COURT:  Okay.  I have that total.

4        MR. RODRIGUEZ:  And the total net worth should be

5   reflected as -- I have it, and then she even has the

6   difference, which is a bit lower, but it's $1,300,464.80.

7        THE COURT:  0.08?

8        MR. RODRIGUEZ:  0.80.

9        THE COURT:  0.80.  Okay.  So that's $1,300,464.80?

10        MR. RODRIGUEZ:  That's correct.

11        THE COURT:  Okay.  This is paragraph 69.  Okay.

12             Any other additions or corrections you want to

13   make?

14        MR. RODRIGUEZ:  No.  Other than that, Your Honor,

15   everything has been corrected.  And I commend Ms. Moran for

16   really working with me and helping me out in this matter and

17   being patient.  Some of these documents I had to translate

18   from --

19        THE COURT:  Okay.

20        MR. RODRIGUEZ:  -- from down there, from Colombia to

21   here.  And the last -- I think the worst thing I ever did in

22   college was accounting, so for me it was problematic.

23        THE COURT:  Very well, sir.

24        MR. RODRIGUEZ:  Thank you very much.  I'll -- I'll

25   come back and argue after --

1           THE COURT:  Yeah.

2           MR. RODRIGUEZ:  -- Mr. Zwerling's presentation.

3           THE COURT:  We'll get to that.

4               Mr. Ben'Ary, do you have any additions or

5    corrections or comments on the suggested changes that Mr.

6    Rodriguez has made this morning?

7           MR. BEN'ARY:  No, Your Honor.  There's no objection to

8    the Court making those changes.

9           THE COURT:  Okay.  I'll adopt those changes.  Okay.

10   And the Government doesn't have any other additions or

11   corrections?

12          MR. BEN'ARY:  No, Your Honor.

13          THE COURT:  Okay.  I'll adopt the presentence report

14   with the additions or corrections that have been made.  He's a

15   39, VI, which is 360 to life.  With a plea agreement, he's ten

16   to 15 years.

17               Okay.  So I'll hear argument on that.

18          MR. ZWERLING:  Your Honor.

19          THE COURT:  Mr. Zwerling.

20          MR. ZWERLING:  Would the Court indulge us to split the

21   argument?  I'm going to do an introductory and touch on a

22   couple of things, and then Mr. Rodriguez will do the --

23          THE COURT:  Very well.

24          MR. ZWERLING:  Thank you.

25               Your Honor, first thing I wanted to address was the

1  effect of the terrorism enhancements in the guidelines.

2          THE COURT:   Okay.   I was surprised that he got a 39,

3  VI in the beginning.   But apparently that's what -- VI is given

4  to --

5          MR. ZWERLING:   Right.

6          THE COURT:   -- terrorist enhancement.

7          MR. ZWERLING:   The -- the crime itself is material

8  support to a terrorist organization, which would seem to

9  encompass terrorism.   And when they did the guidelines for that

10  offense, you would have thought they would have included the

11  fact that it was materially supporting terrorism or terrorists.

12  And that the -- well, we did agree, when we entered into our

13  agreement, that the application of the 3B1 is correct.   It --

14  in this case it leads to an absurd result because it gives you

15  a guideline sentence that is double the maximum penalty by the

16  statute.   That doesn't seem to be very helpful.   The guidelines

17  are supposed to tell the Court where within the statutory

18  punishment range the Court should focus, as being the heartland

19  of sentences.

20          So this gives you, the Court, no help really

21  because it's double -- it's more than double the maximum

22  penalty.   And what we would ask the Court to do in coming to

23  our recommended sentence, which is a ten-year sentence, is to

24  find that the category VI criminal history overstates Mister --

25  General Santoyo Velasco's life history, vis-à-vis crime.   He's

1 never been arrested before in his life.

2          And I recognize that that enhancement will have

3 that effect on some people.  That it won't -- it will have that

4 effect on the people who have never been in trouble, but it

5 won't have much of an effect on people who are genuinely

6 category VI offenders.  So it seems to punish more severely

7 those with no criminal history than those with an extensive

8 criminal history.

9          The other thing about it is that it will affect

10 where he serves his time, what type of facility he's going to

11 have to serve his time.

12          THE COURT:  Do you have a recommendation on that?

13          MR. ZWERLING:  We do, Your Honor.  And Mr. Rodriguez

14 is going to speak to that.

15          THE COURT:  Okay.

16          MR. ZWERLING:  But we ask the Court to reduce his

17 category -- Criminal History Category to a I or a II so that he

18 can be sent to the type of a place that we're asking for and

19 not wind up with -- with the people in supermax in Colorado or

20 similar places, penitentiaries, because of the category VI

21 history.  And we would ask the Court to increase his guideline

22 range by five levels instead of 12, to vary down to that.

23 We're not asking the Court to --

24          THE COURT:  Okay.

25          MR. ZWERLING:  -- depart, but to vary down to that,

1    and that would give a guideline range starting at 121 months.

2                THE COURT:  Okay.  What's the offense level?

3                MR. ZWERLING:  That would be...

4                So, it would be a 32, Your Honor, if he's a

5    category I.  That would be 121 months.  So there instead of a

6    39, so that would be seven levels down.

7                THE COURT:  You have 121 to 151.

8                MR. ZWERLING:  Yes, Your Honor.

9                THE COURT:  All right.

10               MR. ZWERLING:  And that said, Your Honor, one area of

11   this case that I would like to address before Mr. Rodriguez

12   gets up is the peculiar nature of this offense in that this

13   isn't the case where somebody is sending money or guns or

14   things like that to help al-Qaeda or something like that.  This

15   is a situation in Colombia where you have a government, a

16   democratically elected government, that has been fighting for

17   as long as I've -- I've been aware.  Marxist rebels who are

18   trying to overthrow the government, and that would be the FARC

19   and their allies.  And they, in order to support their

20   revolutionary aims, got into drug dealing, kidnappings,

21   murders, extortion on all types of criminal behavior.  The

22   government basically was at war with them, similarly to Kabul

23   and the Taliban, and -- but they couldn't be everywhere at

24   once.

25               So as a result these right-wing paramilitary groups

1   grew up, supported initially by the landowners and the citizens

2   in areas where the government didn't have control to protect

3   them from the FARC.  And the government worked with these

4   groups in various ways over the years, and less so in more

5   recent days, because these groups started to get into the same

6   type of criminal behavior to support themselves that the FARC

7   had.  The main difference between the two in the latter days is

8   that FARC was trying to overthrow the government, and that was

9   not the aim of these other groups.  They had become more of

10  just general criminal elements that were into drug dealing,

11  into kidnappings, doing awful things in the name of fighting

12  the FARC.

13          But the government had a relationship that was a

14  lot stronger with the AUC than with the FARC.  And that is

15  where Mr. Santoyo got in trouble because he had been a police

16  officer for decades, over 30 years, and he's been involved in

17  fighting the FARC for over 30 years.  And in the beginning when

18  he was working to build relationships with informants and

19  people with information, a lot of them were connected with or

20  high up in the AUC and the related groups that were associated

21  with them and developed relationships with them.  And in the

22  latter years, he started to take financial gifts.  The

23  Government calls it bribes, and that's --

24          THE COURT:  About seven years, right, from 2001 to

25  2008?

1       MR. ZWERLING:  That's the range of the conspiracy,

2  Your Honor.  And it -- the thing that we take issue with in our

3  memo is the significance of the amounts.  They're getting their

4  information from informants who some of which, you know, don't

5  have direct knowledge, and it's part of a rumor mill, you know.

6  And others, you know, have exaggerated, in our opinion -- and

7  that's our assertion -- in order to make their information of

8  more value to the government.  I'm sure the Court is aware that

9  that does happen.

10       We're not here to get into an

11  informant-by-informant fight over whether this informant's

12  information came from Joe Blow and this is his motivation.

13  That's not what this hearing is really about.  It's just our

14  position that, you know, he -- you have his financial

15  statements.  You can see that the majority of his assets were

16  from inheritance and from building a business over the years.

17       It's not to say that the additional money wasn't

18  well-received on his part and utilized, you know, to support

19  his family and to do things that he otherwise couldn't afford.

20  And that's why he's here, and that's why he's pled guilty.

21       The other thing the Court -- so, in determining

22  where between the ten years and the 15 years, we would want to

23  submit mitigation to the Court to encourage the Court to

24  mitigate the maximum penalty allowed by law and come down to

25  the ten or closer to the ten.

1        THE COURT:  Let me -- has he been cooperative?

2        MR. ZWERLING:  He has been -- that's really more for

3   the Government to say, Your Honor, but my information is that

4   he's been extremely cooperative from before his arrest.

5        When he found out the Government were as interested

6   in him, he voluntarily had, I believe, four meetings with the

7   United States authorities, both in the United States and other

8   places in the Caribbean.  And then when he found out there was

9   an indictment, he agreed to meet the DEA, get on their plane,

10  and come back to the United States with no extradition

11  proceedings, nothing.  And that since he's been here, he has

12  been available to them and has given them information in their

13  debriefs that they've had, and that I suspect and hope they

14  will continue to have.  Because he wants to make -- get the

15  whole story out, and he wants to be as helpful as he can.

16        Thank you, Your Honor.  Mr. Rodriguez will...

17        THE COURT:  You want to -- I'll let him answer this

18  part of it and then I'll...

19        MR. BEN'ARY:  Just briefly, Your Honor, with the

20  Court's permission, I want to address the -- the guideline

21  issue.

22        THE COURT:  Yeah.

23        MR. BEN'ARY:  As I understand the sentencing régime,

24  the first thing that the Court has to do is correctly calculate

25  the guidelines.  And in this case, a correct calculation of the

1  guidelines includes the application of that terrorism

2  enhancement because the defendant's conduct meets the prongs of

3  that enhancement.

4       I don't believe that it's the case to pick what

5  your ultimate sentence is and then ask the Court without

6  further basis to adjust the criminal history and the guideline

7  level to fit it.  Now the Court, after correctly calculating

8  the guidelines, can do exactly what the defense asks in terms

9  of a variance.  But in terms of a correct guidelines

10 calculation, it is as it appears in the presentence report.

11      THE COURT:  Well, his argument is that the category VI

12 overstates his criminal history.

13      MR. BEN'ARY:  Well -- but, Your Honor, it is a

14 Criminal History Category VI because of the application of the

15 terrorism enhancement.  Now the Sentencing Commission has made

16 the decision that because of the danger posed by people that

17 undertake terrorist acts is so great, that anyone that gets

18 that enhancement applied to them is automatically a Criminal

19 History Category VI, and I don't believe it's appropriate to

20 then go around that by adjusting it back downwards.

21      It is a Criminal History Category VI that is

22 proper, and that's because the Sentencing Commission has made

23 the decision that those that undertake this type of activity

24 should be treated because of the dangerousness, because of

25 other factors that they consider should be considered in the

1   same category as those that have had a career of offenses.  So,

2   I don't think that it binds the Court in its final decision,

3   but I -- I do think that a Criminal History Category VI is

4   appropriate and it is only because of that application of the

5   term is terrorism enhancement.  Anyone that gets that

6   enhancement applied is a Criminal History Category VI, no

7   matter what else is on their prior history.

8           THE COURT:  Very well.

9            Mr. Zwerling, any rebuttal?

10          MR. ZWERLING:  Your Honor, the Sentencing Guidelines

11  Commission has also said that if a person has a prior felony,

12  you give three points.  If you -- and so it gives the Court --

13  it directs the Court to, you know, add up the three points for

14  this and the two points for that and come out with a criminal

15  history, and that's how you get to the initial criminal

16  history.  But the Court has the power to make a determination

17  that when you look at the -- at the things that have made up

18  the criminal behavior of the defendant over his lifetime, that

19  that criminal history overstates what it should be.  And the

20  Court then can downgrade the categories to -- you know, from a

21  III to a II or a IV to a II or whatever.  And in one respect,

22  as far as the ultimate sentence is concerned, it may not matter

23  how you get there.  But as far as designation and

24  classification of a defendant, it does matter.  And that's why

25  we ask the Court to find that it overstated it.

1          THE COURT:  Okay.

2          MR. ZWERLING:  Thank you.

3          THE COURT:  Let me -- I'll rule on this aspect of it,

4    and then I'll hear from counsel again on sentencing.

5               Sentences are imposed in accordance with 18, U.S.

6    Code, Section 3553(a).  The Guidelines calculations are just

7    one factor the Court takes into consideration when sentencing.

8    *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United*

9    *States*, 552 U.S. 38 (2007).  I understand that I am free to

10   depart upwards or downwards from the guideline range and to

11   grant variances as *Gall* permits district courts to impose

12   sentences both above and below the guideline recommendations.

13   See *Gall* at 45.  I also understand that under *U.S. v. Nelson*,

14   129 Supreme Court 890, page 892, a 2009 case, a sentencing

15   court may not presume that a sentence within the applicable

16   Sentencing Guidelines range is presumptively reasonable.

17              Certainly the overstatement of criminal history

18   also is an appropriate downward departure in a case, and also

19   it can be the basis for a variance.

20              I decline to do so in this case because I think

21   that the sentencing enhancement based on the terrorists --

22   terrorism is sufficient, and I'm not going to go ahead and vary

23   from that.  So accordingly, I'll leave him at the 39, VI.

24   Okay.

25              All right.  Mr. Rodriguez, I'll take your argument

1   as to where to put him within the ten to 15 years range.

2          MR. RODRIGUEZ:  May I?

3          THE COURT:  Yes, sir.

4          MR. RODRIGUEZ:  Your Honor, once again, thank you very

5   much.

6                 I -- the purpose of my argument to you today is

7   basically that we feel that under the -- the plea agreement

8   that we entered with the United States and the fact that the

9   Government contemplated that we could argue for a sentence of

10  ten years, or 120 months, and they would be asking for 15

11  years, or 180 months, there would be a -- a gap where the

12  judge -- where Your Honor could understand and take into

13  consideration the actions of the defendant that he took in an

14  effort to correct this matter.

15                I would like to point to the Court, Your Honor,

16  that the General served his country for a period of 27 years,

17  beginning as a mere policeman and rising to officer and rising

18  to a -- to the rank of General.

19                While being a colonel in the Gaula, or the

20  anti-kidnapping department in Medellin, he saved and solved

21  more than 297 kidnappings during this time.

22                In one of these kidnappings, Your Honor, he was

23  shot and injured and in -- received a bullet in the leg two

24  days before he was about to get married.  Of course, it was a

25  delay in the marriage, but nevertheless, he was serving his

1    country and continued serving his country.

2              Later on because of the efficient work that this

3    gentleman did, as an officer and in -- as an officer in charge

4    of the Gaula and because he was in Medellin during that period,

5    the governor of Medellin was the person who later would be

6    president, Álvaro Uribe.

7              At that time, because of his reputation and because

8    of his bravery, Mr. Uribe named him as his personal security,

9    and he was with him while he was governor, and he was later

10   named the secretary of the defense of the president or in

11   charge of the president's detail for -- for many years.

12             He was -- in fact, during the process that he was

13   in charge of the -- of the president's security at one time,

14   there were -- there was an attempt on the president, and a bomb

15   exploded very close to -- to where he was with the president.

16   And though the president was saved without any problems, the

17   General, as the result of the bomb, lost ear -- lost hearing.

18   And today, as we stand before the Court, he has lost

19   considerable amount of hearing because of the resulting result

20   of that particular attempt.

21             Your Honor, we do -- though he represented his

22   country honorably, we realize and he realizes that he made some

23   mistakes.  He realizes that he did take some compensation, and

24   that he did make some mistakes during the course of what

25   started out in Medellin to gather information and to gather --

1 and to gather information on possible crimes and things, that

2 you start talking to some of the -- these people that can

3 provide you information, and eventually the General did fall

4 and -- and receive some illegal compensation.

5        We -- he realized it, but he continued on.  That --

6 that was for a period from 2001 to 2006.  After that -- or

7 2008.

8        After that, he continued his -- his career.  He,

9 upon knowing that he was being investigated by the United

10 States, voluntarily met with the United States, like my

11 co-counsel said -- and I don't mean to be repetitious -- on

12 four different occasions, extensively on the rules of -- set by

13 the United States and the U.S. Attorney in this particular

14 case.

15        He met.  He was under the impression that he was

16 going to try to -- that he was cooperating.  In lieu of being

17 indicted, however, that did not occur, and he was later on

18 indicted.

19        Upon being indicted, he made arrangements to

20 surrender.  He did not hide behind the curtain of extradition;

21 did not go running.  He surrendered himself.  They send a --

22 voluntarily surrender himself.

23        They send a plane for DEA, and he came in without

24 any promises, without any -- without expecting anything, but

25 with his -- with his desire to continue cooperating, to

1   continue his name, clear his name, and to most importantly

2   correct whatever wrong he had committed.

3           I think taking in the light positive, this is a

4   total acceptance of responsibility.  This is a total break with

5   the life that he may have fallen into and have left, and this

6   is a way of accepting the fall that he had taken and honorably

7   tried to correct it.  And I think, Your Honor, this is -- this

8   is a very important factor when the Court is considering the

9   issuance of a -- of a sentence and applies the variances of

10  18, U.S.C., 3553(a).

11          I think that -- though the nature of this offense,

12  because of the charge, is a very serious and harsh offense.

13  There is -- there is space for which the conduct of the General

14  falls below the 15 years and falls well below within the ten

15  years as -- as was agreed to and allowed by the Government

16  to -- to argue.

17          Your Honor, our position is that these 12 points

18  that were added was in an effort to secure the position of the

19  Government in the 15 years, because if you look at the table

20  of -- of the providing of the statute, of the

21  guidelines providing support material, that particular

22  guideline is much lower.  So with the 12 points, it raises to a

23  42 where it would be -- otherwise would be a 26 plus four, plus

24  two, plus two, and it would a 30 less three at 27.

25          But we're not asking for a variance in that sense.

1    We signed for ten years.  We realized when we were signing the

2    plea agreement that we could ask for ten years and that the

3    Government could ask for 15 years.  But I think that the -- the

4    facts in this particular case, as they apply to General

5    Santoyo, do fit the role where -- where the Court should

6    consider a lower -- imposing the lower sentence allowable,

7    which is that of ten years.

8              Your Honor, I could reemphasize and go on, but I

9    think that -- that first your indication that it's a category I

10   is one of the things that's completely very -- ruling of a

11   category I would be very important because we think that this

12   is something that would be extremely harsh on him.

13             We will be asking the Court if the Court could

14   recommend at the time of sentencing today that the defendant

15   be, whenever he's placed, whenever he's finished with his --

16   with his duties here, to be sent to Coleman, Florida.  FCI

17   Coleman in Florida where he's a --

18             THE COURT:  Okay.  I'll grant your motion as to that.

19             MR. RODRIGUEZ:  Okay.  Thank you very much.

20             And we feel, Your Honor, that if you grant -- if

21   you vary or grant a variance to a level 32, which is basically

22   from a 39 to a 32 is to lower the five points and grant a

23   sentence of 121 months, it would serve and satisfy the plea

24   agreement in which we agree and sign.  And that sentence alone

25   after cooperation, after self-surrender, and after just coming

1  without any expectations, it's harsh enough to show first that

2  the United States do take into account and do recognize the

3  good acts of people who make mistakes and try to correct

4  their -- their wrongs; and secondly, sends out a harsh enough

5  message that people similarly, like him, would be in a position

6  to consider this and -- and neither surrender themselves or

7  know that the law would be very harsh on them upon being

8  apprehended.

9          Your Honor, thank you very much.  I hope I did not

10  speak too much.

11          THE COURT:  No, it's --

12          MR. RODRIGUEZ:  It's been a pleasure --

13          THE COURT:  Don't apologize for that.

14          MR. RODRIGUEZ:  -- to be before you.

15          THE COURT:  It's an important case.  I'm glad to hear

16  from you.

17          MR. RODRIGUEZ:  It's been a pleasure being before you,

18  Your Honor, and we hope that you realize that the facts in this

19  particular case show not a terrorist or not one that -- but one

20  good man who made a mistake, and as a result of that, he's paid

21  or he's paying very severely and very harshly.

22          Have a good day and thank you very much.

23          THE COURT:  Mr. Ben'Ary.  Let me ask you, Mr. Ben'Ary,

24  at the outset, I mean, 39, VI is 360 to life which is more than

25  the 15 years by the statute.  Isn't the more appropriate

1  category is argued by Mr. Zwerling at 32, I; 121 to 151?

2       MR. BEN'ARY:  Well, no, Your Honor.  A correct

3  calculation of the -- just talking about the guidelines -- and

4  I was under the impression that the Court ruled.

5       THE COURT:  Yeah.

6       MR. BEN'ARY:  A correct calculation of the guidelines

7  is 39, VI because --

8       THE COURT:  Yeah, I've ruled that way, but --

9       MR. BEN'ARY:  So I agree that the Court could vary,

10  but if you're talking about the legally correct calculation of

11  the guidelines, it is -- it is the way that the probation

12  office calculated it.

13       THE COURT:  Unfortunately, that seems to be the case.

14       MR. BEN'ARY:  And --

15       THE COURT:  Okay.

16       Go ahead.

17       MR. BEN'ARY:  Moving past the guidelines, because as

18  the Court said and as everyone knows, the guidelines are merely

19  one factor that the Court needs to consider.  Overall, Your

20  Honor, this case at its base is about betrayal.

21       You have sitting before you someone who had a

22  distinguished -- no question -- distinguished career as a

23  Colombian law enforcement official.  And that's really --

24  that's really the confusing thing about the case, Your Honor,

25  because while it certainly is a mitigating factor, isn't it

1   also what makes this case an aggravated case because the

2   defendant had risen to a level where he had access to

3   information helpful to terrorists.  He had risen to a level

4   where he had influence, and terrorists were buoyed in their

5   efforts simply by knowing that they had access to someone at

6   that high level.  And didn't the defendant know because of his

7   years of service what a horrible impact providing help,

8   providing information to these terrorists would be.

9          Your Honor, as a patrol officer, if someone had

10  told this defendant that his commanding officer, that the

11  General of his unit was working with the very targets of his

12  investigation, it would have been disastrous to his morale, it

13  would have been disastrous to his efforts as a patrol officer.

14         And so when the defendant, as the head of the

15  Gaula, the anti-kidnapping forces in Medellin provided help to

16  AUC, these kidnappers, these assassins, these drug traffickers,

17  he had to know that that impact would be felt by patrol

18  officers within the Colombian National Police.  He had to know

19  that it would be felt by other Colombian military and law

20  enforcement members because his actions were putting them in

21  danger and frustrating their cause.  He had to know that his

22  actions had a bad impact on law enforcement in the United

23  States because as the -- as the defendant knew, Colombian law

24  enforcement worked closely with United States law enforcement,

25  including DEA.

1            But most of all, Your Honor, because the defendant

2    started out as a patrolman, worked up through the ranks, had

3    risen as high as he is, is as smart as he is, he had to know

4    that his actions were bad for the Colombian people.

5            Now, it is true, perhaps, that the defendant

6    thought that he could gain information from these AUC members

7    to fight the FARC, Your Honor, but AUC, while smaller than the

8    FARC, is no less dangerous, no less brutal, was involved in the

9    same type of criminal activities from assassination to drug

10   trafficking.  And the defendant knew that because he was the

11   head of the anti-kidnapping anti-terrorism unit.

12           In terms of the amounts that the defendant took in

13   terms of financial compensation for his actions, that's not the

14   significant factor in this case.  The defendant didn't need

15   whatever amounts he took, as you've heard.  He knew that he was

16   helping out people that were conducting murders, conducting

17   kidnappings, conducting assassinations, and were a danger to

18   his colleagues, both in Colombia and the United States, and the

19   Colombian people, the very people that he was entrusted with

20   protecting.

21           And so, Your Honor, in dealing with where in the

22   10- to 15-year range the defendant should be sentenced, there

23   is no question that the Court should consider his distinguished

24   career as a mitigating factor.  There's no question that the

25   Court should consider the fact that he has accepted

1  responsibility, and that he has cooperated with the United

2  States.  And I -- I expect to be back on another proceeding

3  where we're going to deal with --

4          THE COURT:  You feel there would be a Rule 35?

5          MR. BEN'ARY:  I can't tell the Court because it's a

6  decision that gets made by a committee, but I think that that's

7  a significant --

8          THE COURT:  But he's been cooperative with you?

9          MR. BEN'ARY:  He has been.

10          And so I think the important thing that the Court

11  has to balance here is those mitigators, how -- taking those

12  into consideration, but also taking into consideration that the

13  same mitigating factors are also aggravating factors, what's

14  the appropriate sentence.  Certainly had the -- had the

15  defendant not had the distinguished career and had he not

16  cooperated, the United States may have insisted on proceeding

17  on other charges that had a higher statutory max, but we did

18  not because we felt that this range allowed a significant

19  leeway in fashioning the appropriate sentence.

20          But we do feel that it's important to impose a

21  sentence that sends the message that this type of dangerous

22  activity, this type of betrayal by someone so high in law

23  enforcement will be treated severely.  Certainly people in this

24  area being so close to the nation's capital are in tune to the

25  bad effects of public corruption and corruption of government

1  officials.  That I think sensitivity is heightened in Colombia

2  where they've had ongoing problems with public corruption.

3          The message that this Court's sentence needs to

4  send, Your Honor, respectfully is that those who have these

5  distinguished high positions with access to information, if

6  they choose to take the financial bait and disclose helpful

7  information to those who their -- from whom they are supposed

8  to be protecting the public, they are going to be met with

9  harsh sentences.  They're going to be prosecuted, whether here

10  or abroad, and the sentences are going to reflect the danger

11  that this activity causes.

12          And so for those reasons, Your Honor, the United

13  States' position is that a 15-year sentence is appropriate.

14          Thank you.

15          THE COURT:  Okay.  General, you want to come to the

16  podium, please.

17          Anything you want to say before I pronounce

18  sentence on you?

19          THE DEFENDANT:  Your Honor, I recognize that I've made

20  a mistake, that I made mistakes.  I am very sorry, and

21  responding that I'm here.

22          I apologize to my family for the difficult position

23  that I've put them into, and I ask you to be benevolent in

24  considering your sentence.

25          Thank you.

1          THE COURT:  The Court is going to commit you to the

2     Bureau of Prisons for 13 years.

3          Upon release from imprisonment, you're to complete

4     a five-year term of supervised release.  As a condition of

5     supervised release, upon completion of your term of

6     imprisonment, you are to surrender to a duly-authorized

7     immigration official of the Department of Homeland Security,

8     United States Immigration and Customs Enforcement for

9     deportation review in accordance with established procedures

10    provided by the Immigration and Naturalization Act, 8, U.S.

11    Code, Section 1101, et cetera.

12          As a further condition of supervised release, if

13    ordered deported, you shall remain outside the United States.

14          You shall pay a $125,000 fine, due and payable

15    immediately.

16          And I'll note that you are married, have three

17    children, only one of whom is dependent upon you.  And you

18    certainly have the assets to pay that fine.

19          $100 special assessment is also due.  Both the fine

20    and the special assessment are due now in this case, and I'm

21    going to give you credit for time served in this case.

22          This sentence reflects the nature and

23    circumstances; seriousness of the offense.  And certainly it is

24    a serious offense because it's a conspiracy to provide material

25    support and resources to a foreign terrorist organization.

1          Reflects the history and characteristics to the

2    defendant.  You certainly have spent a long time in law

3    enforcement in Colombia.  You rose to the rank of General.  You

4    apparently are also involved with saving or rescuing 297 people

5    during that time.

6          And I'll note also in this case that you cooperated

7    with the law enforcement, and a risk to yourself and your

8    family.  But you did provide from October '01 to November '08

9    material support to a designated foreign terrorist

10   organization, the self-defense foreign forces of Colombia, or

11   AUC, and you worked in the anti-terrorist unit.

12         And I'll note that you waived extradition, and you

13   voluntarily came to the United States.  I've given you credit

14   for that.

15         You're 53 years old.  In this case, the Court feels

16   that this provides adequate deterrence to criminal conduct;

17   provides just punishment for the offense; protects the public

18   from further crimes of defendant; and avoids unwarranted

19   sentencing disparities.

20         The thing and unusual part of this case is the fact

21   that you were a law enforcement officer and did a lot of good.

22   And unfortunately for that seven-year period, you were involved

23   in tipping off the AUC and providing them aid and support.

24         You are remorseful.  I've considered that.  I've

25   considered also the fact that you're going to be deported in

1  fashioning this sentence, and also the fact that you've been

2  cooperative with the Government.

3              Do you understand the sentence?

4         THE DEFENDANT:  Yes, Your Honor.

5         THE COURT:  Okay.  I'll remand him to the custody of

6  the Marshal, and give him the credit for time served.

7              Any particular place you want to recommend?

8         MR. RODRIGUEZ:  Your Honor, as I mentioned before --

9         THE COURT:  Yeah, you did.  I granted your motion as

10  to that --

11         MR. RODRIGUEZ:  Thank you very much.

12         THE COURT:  -- and as to Florida.

13              Okay.  Thank you.

14              I remand him to the custody of the Marshal at this

15  time.

16              Thank you.

17         (PROCEEDINGS CONCLUDED AT 10:15 A.M.)

18                          -oOo-

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT    )

2  EASTERN DISTRICT OF VIRGINIA    )

3

4          I, JULIE A. GOODWIN, Official Court Reporter for

5  the United States District Court, Eastern District of Virginia,

6  do hereby certify that the foregoing is a correct transcript

7  from the record of proceedings in the above matter, to the best

8  of my ability.

9          I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action in

11  which this proceeding was taken, and further that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14          Certified to by me this MAY 13TH day of DECEMBER,

15  2013.

16

17

18

19                          ___/s/_____

20                          JULIE A. GOODWIN, RPR
                            CSR #5221
                            Official U.S. Court Reporter
21                          401 Courthouse Square
                            Tenth Floor
22                          Alexandria, Virginia  22314

23

24

25